UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| KIMBERLY K., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:21-cv-02904-TAB-JPH |
| ) | |
| KILOLO KIJAKAZI, Acting Commissioner of ) | |
| Social Security, ) | |
| ) | |
| Defendant. ) | |

**ORDER ON PLAINTIFF'S
BRIEF IN SUPPORT OF COMPLAINT**

**I.      Introduction**

Plaintiff Kimberly K. seeks judicial review of the Social Security Administration's denial of her application for disability insurance benefits. [Filing No. 10.] Plaintiff is seeking benefits from July 1, 2014, to May 31, 2016, when she returned to work. This Court previously remanded Plaintiff's claim because the Administrative Law Judge had not demonstrated that she considered the evidence related to Plaintiff's migraine headaches during the relevant period. Following remand, Plaintiff has once again identified deficiencies with the ALJ's subsequent decision. For the reasons detailed below, the Court remands the ALJ's decision.

**II.     Background**

Plaintiff's disability insurance benefits application alleges a disability onset date of April 22, 2013. Her application was denied initially and upon reconsideration. Plaintiff amended her alleged onset date to July 1, 2014. The ALJ conducted a hearing and on June 1, 2017, denied Plaintiff's claim. The Appeals Council denied review. This Court remanded Plaintiff's claim for further proceedings. The ALJ conducted another hearing and on March 25, 2021, again denied

Plaintiff's claim. The ALJ found that Plaintiff "had the following severe impairments: cervical degenerative disc disease, fibromyalgia, tendonitis, carpal tunnel syndrome, obstructive sleep apnea, restless leg syndrome, morbid obesity, migraine headaches, anxiety, and depression." [Filing No. 6-19, at ECF p. 16 (citation omitted).] The ALJ found Plaintiff's RFC to be limited as follows:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can lift, carry, push, or pull twenty pounds occasionally and ten pounds frequently. She can stand and/or walk two hours and sit six hours in an eight-hour workday. She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She can never climb ladders, ropes, or scaffolds. She can occasionally reach overhead bilaterally. She can frequently handle and finger. She must avoid all exposure to extreme cold and extreme heat. She can tolerate no more than occasional exposure to environmental irritants and poorly ventilated areas. She must avoid all exposure to unprotected heights and dangerous moving machinery. The noise level must not exceed level 3. She cannot perform a job with strobe or flashing lights in the ordinary course of business. She must avoid exposure to excessive vibration. The job must not require driving or operating a motorized vehicle to perform functions of the job. The job must not require complex written or verbal communications or complex decision-making. The work must be limited to simple, routine, repetitive tasks, that is short cycle work, where the same routine tasks are performed over and over according to set procedures, sequence, or pace with little opportunity for diversion or interruption. Such work must have a short initial learning period of usually 30 days or less. The job must not require tandem tasks or teamwork. The job must not require fast-paced or assembly line production requirements. She can tolerate occasional, brief interactions with the general public, coworkers, and supervisors. The job must not require more than occasional, routine workplace changes. She can tolerate normal supervisory interactions as needed, including, for example, performance appraisals, corrections, instructions, and directives as necessary. She can tolerate interactions to receive instructions as needed for task completion of simple, routine, repetitive work. She can exercise judgment in making work-related decisions commensurate with simple, routine, repetitive work. The job must not require telephone communication.

[Filing No. 6-19, at ECF p. 20-21.] Continuing with the five-step determination, the ALJ ultimately found that there were many jobs that Plaintiff could have performed in the national economy, such as a document specialist, gauger, and printed circuit board touchup screener.

Accordingly, the ALJ concluded that Plaintiff was not disabled from the amended alleged onset date through May 31, 2016.

### III. Discussion

Plaintiff raises four errors, arguing that the ALJ: (1) failed to sufficiently articulate whether Plaintiff met or equaled various listings, (2) did not include in Plaintiff's RFC that she would have been expected to be off task and absent, (3) failed to follow this Court's order to discuss possible entitlement to a closed period, and (4) failed to consider Plaintiff's combined impairments when assessing her RFC.

Before addressing the arguments raised by Plaintiff, some further background is necessary. At Plaintiff's first hearing in February 2017, she testified that ever since she was hired in May 2016, she worked 35 hours per week as a young adult coordinator for a library.[1] [Filing No. 6-2, at ECF p. 38-39.] In the ALJ's first decision, she found that Plaintiff had earned substantial gainful activity since the third quarter of 2016 "and thereafter." [Filing No. 6-2, at ECF p. 13-14.] If the claimant is engaged in substantial gainful activity, she is not disabled regardless of her medical condition and any other factors. 20 C.F.R. § 404.1520(a)(4)(i). However, a claimant is entitled to a period of disability so long as she satisfied the definition of disability for a continuous period of not less than twelve months (and had filed an application within the appropriate timeframe relative to that period). 20 C.F.R. §§ 404.315; 404.316; 404.1505. The Seventh Circuit has explained that "[b]efore limiting benefits to a closed period, an ALJ must conclude either that a claimant experienced 'medical improvement' as evidenced by changes in the symptoms, signs, or test results associated with her impairments, or else that an

---

[1] Plaintiff also testified that she was working part time at two other jobs as an adjunct professor teaching childhood education classes online and preparing a sales newsletter. [Filing No. 6-2, at ECF p. 38-41.] Plaintiff has a master's degree in educational psychology. [Filing No. 6-2, at ECF p. 45.]

3

exception to this rule applies." *Tumminaro v. Astrue*, 671 F.3d 629, 633 (7th Cir. 2011) (quoting 20 C.F.R. § 404.1594(a), (b)(1) (other citations omitted)).

Plaintiff also testified during the first hearing that she had been working full time for the Villages of Indiana as a therapist for children and families in the foster care system. [Filing No. 6-2, at ECF p. 41.] She testified that her "migraines had gotten significantly worse" and she "chose to go part time." [Filing No. 6-2, at ECF p. 43.] But "[t]he migraines continued and [her] attendance became an issue . . . so they chose to cut [her] hours," "[b]asically to zero," and she "was laid off" in July 2014. [Filing No. 6-2, at ECF p. 44.] She explained that her migraines were getting more frequent and intense, and her medication, Relpax, was no longer providing her the same relief. [Filing No. 6-2, at ECF p. 49.]

Plaintiff further testified that around the time she started working at the library, she "had gone to a new neurologist who prescribed Memantine, and that seem[ed] to be working."[2] [Filing No. 6-2, at ECF p. 49.] She did not think before she started taking memantine that she could have sustained working more than two or three months. *Id*. She also testified that her employer at the library was "very flexible," allowed her to come in late, leave early if she had a migraine, go home if she needed to get medication, miss work (unpaid) if she had exhausted her personal time, and even drove her home from work when she was unable to drive. [Filing No. 6-2, at ECF p. 60.]

---

[2] Memantine is the common form of a drug also prescribed under the name brand, Namenda, that is used to treat dementia caused by Alzheimer's disease, but can also be used "for other purposes." Cleveland Clinic, https://my.clevelandclinic.org/health/drugs/18600-memantine-tablets (last visited Oct. 17, 2022).

**A. Listing 11.02**

To meet a listing, a claimant must establish with objective medical evidence the precise criteria that is specified. *See* 20 C.F.R. § 404.1525; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) ("The applicant must satisfy all of the criteria . . . ."). In the alternative, a claimant can establish "medical equivalence" in the absence of one or more of the findings by other findings related to the impairment or a combination of impairments that are of equal or greater medical significance. *See* 20 C.F.R. § 404.1526(a)-(b). Because listings establish presumptive disability, the criteria are "interpreted strictly." *Wilder v. Kijakazi*, 22 F.4th 644, 651 (7th Cir. 2022). In considering whether a claimant's impairments meet or equal a listing, an ALJ must discuss the listing by name and offer more than a perfunctory analysis. *See, e.g.*, *Minnick v. Colvin,* 775 F.3d 929, 935-36 (7th Cir. 2015). To demonstrate that an ALJ's listing conclusion was not supported by substantial evidence and a more thorough analysis could have led to a different outcome, the claimant must identify evidence that was misstated or ignored that met or equaled the criteria. *Jeske v. Saul,* 955 F.3d 583, 589-91 (7th Cir. 2020); *Sims v. Barnhart*, 309 F.3d 424, 429-30 (7th Cir. 2002).

Listing 11.02, normally reserved for evaluation of seizures, requires in relevant parts:

> 11.02 Epilepsy, documented by a detailed description of a typical seizure and characterized by A, B, C, or D:
> [. . .]
> B. Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); or
> [. . .]
> D. Dyscognitive seizures (see 11.00H1b), occurring at least once every 2 weeks for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:
> 1. Physical functioning (see 11.00G3a); or
> 2. Understanding, remembering, or applying information (see 11.00G3b(i)); or
> 3. Interacting with others (see 11.00G3b(ii)); or
> 4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or

      5. Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R. § Pt. 404, Subpt. P, App. 1, 11.02(B); (D). Social Security Ruling ("SSR") 19-4p, (S.S.A. Aug. 26, 2019), 2019 WL 4169635, at *7,[3] provides guidance about the evaluation of primary headache disorders, including that they can equal but not meet a listing. The ruling explains:

> Epilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI [medically determinable impairment] of a primary headache disorder. While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and [the SSA] may find that his or her MDI(s) medically equals the listing.

*Id*.

      Here, the ALJ addressed Listing 11.02 in the context of Plaintiff's migraines, but the entirety of the ALJ's discussion of the listing at Step Three is as follows:

> While there is no specific listing for headaches or migraines, the undersigned has considered the claimant's impairments under Listing 11.02 (*Epilepsy*), the most analogous listing for considering medical equivalence. This requires a professional observation, or third-party description, of a migraine headache event that is supported by medical evidence in the case file as well as:

---

[3] Regarding SSR 19-4p's effective date of August 26, 2019, the ruling explains that the SSA "will use this SSR beginning on its applicable date. [The SSA] will apply this SSR to new applications filed on or after the applicable date of the SSR and to claims that are pending on and after the applicable date. This means that [the SSA] will use this SSR on and after its applicable date in any case in which [the SSA] make[s] a determination or decision. [The SSA] expect[s] that Federal courts will review [the SSA's] final decisions using the rules that were in effect at the time [the SSA] issued the decisions. If a court reverses [the SSA's] final decision and remands a case for further administrative proceedings after the applicable date of this SSR, [the SSA] will apply this SSR to the entire period at issue in the decision [the SSA] make[s] after the court's remand." SSR 19-4p, 2019 WL 4169635, at *8 n.27. Accordingly, because Plaintiff's case was remanded after SSR 19-4p's effective date, the ruling applies to Plaintiff's claim. [Filing No. 6-21, at ECF p. 41 (Appeals Council order on July 8, 2020, remanding the case back to the ALJ pursuant to the district court's order).]

> 1. A detailed description from someone, preferably a medical professional, who has observed at least one typical headache event, describing all associated phenomena;
> 2. Frequency of headache events;
> 3. Adherence to prescribed treatment;
> 4. Information about "alteration of consciousness," which means a condition of being inattentive, or not cognizant of one's surroundings and external phenomena as well as one's personal state;
> 5. Limitations in functioning that may or may not be associated with the effects of migraine treatment, such as interference with activity during the day, e.g., the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations.
>
> The claimant submitted headache questionnaires indicating she has pain, vision loss, difficulty with speech, right side hemiplegia, and vomiting with her headaches; that they occur at least four days a week despite medication and Botox injections; they last anywhere from thirty minutes to three days; and that she is unable to care for herself or her family when she has a headache.
>
> In addition, the undersigned has also considered the overall effects of migraines on functioning. However, there is not a marked limitation in any of the following areas of functioning: physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.

[Filing No. 6-19, at ECF p. 17-18 (citations omitted).] The ALJ's explanation demonstrates only that the ALJ concluded that Plaintiff did not have a marked limitation in one of the functional areas necessary to equal paragraph D of Listing 11.02.

The ALJ's explanation at Step Three does not disclose why the ALJ felt that the evidence did not equal paragraph B of Listing 11.02. The ALJ must provide an "accurate and logical bridge from the evidence to [her] conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). In addition to the questionnaires referenced by the ALJ that Plaintiff submitted to the SSA describing her headache events, she also submitted third-party reports from her spouse and friend describing the relevant symptoms that they had observed. [Filing No. 6-7, at ECF p. 2-8; Filing No. 6-7, at ECF p. 20-27.] The

7

Commissioner contends that the descriptions of Plaintiff's headache events are insufficient to equal the listing because her third-party sources are not acceptable medical sources[4] and the descriptions do not detail everything that is required. [Filing No. 11, at ECF p. 10.] The Commissioner also contends that Plaintiff's reliance on her own reports to demonstrate the frequency of her migraines is insufficient and there is not evidence from an acceptable medical source that documents the frequency of Plaintiff's migraines that is not based solely on her subjective reports. [Filing No. 11, at ECF p. 10-11.] The Seventh Circuit has explained that "[u]nder the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace." *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.") (additional citations omitted)). The ALJ's own description of Listing 11.02's requirements—in the context of the possibility of medical equivalence based on headaches—states that the description of the events may be from a third-party source. There is no indication

---

[4] The SSA recognizes a list of certain categories of medical professional's credentials as "acceptable medical sources." 20 C.F.R. § 404.1502(a). Listing 11.02 "require[s] at least one detailed description of [the claimant's] seizures from someone, preferably a medical professional, who has observed at least one of [the claimant's] typical seizures." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 11.00(H)(2). SSR 19-4p explains that "[t]o evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, [the SSA] consider[s]: A detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations)." 2019 WL 4169635, at *7.

that the ALJ found the evidence concerning the descriptions or frequency of Plaintiff's headaches events insufficient to satisfy the requirements of the listing, let alone any indication that the ALJ found any of the evidence lacking because it was not from an acceptable medical source. The Court cannot rely on possible rationales that the ALJ did not explicitly endorse.

The Commissioner also contends that relevant to the listing's requirement that headache events occur despite "adherence to prescribed treatment," the ALJ explained that Plaintiff had admitted on two occasions when she was seeking emergency treatment for migraine symptoms that she had not taken her prescribed Relpax that day. [Filing No. 11, at ECF p. 11.] The Seventh Circuit has explained that reviewing courts are not confined to the ALJ's analysis in the portion of the decision dedicated to explaining her Step Three conclusions:

> The five-step evaluation process comprises sequential determinations that can involve overlapping reasoning. *See* 20 C.F.R. § 404.1520(a)(4). This is certainly true of step three and the RFC determination that takes place between steps three and four: an impairment so severe that it is presumptively disabling will generally, if not always, leave the claimant without functional capacity to work—that's why the impairment triggers a presumption of disability in the first place. *See id*. § 404.1520(d)-(e). Accordingly, when an ALJ explains how the evidence reveals a claimant's functional capacity, that discussion may doubly explain how the evidence shows the claimant's impairment is not presumptively disabling under the pertinent listing. And, as we've already recognized, "[t]o require the ALJ to repeat such a discussion throughout [the] decision would be redundant."

*Jeske*, 955 F.3d at 590 (quoting *Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015)). The ALJ's explanation of her RFC finding and interrelated credibility evaluation included a summary of Plaintiff's emergency room visits for migraines in January and June 2014. [Filing No. 6-19, at ECF p. 23.] The ALJ explained that "the evidence shows she went to the emergency room just twice in 2014 with complaints of a migraine, and on both occasions she admitted to not taking Relpax that day. She did not otherwise go to the emergency room with complaints of a headache during the period at issue." [Filing No. 6-19, at ECF p. 25 (citations omitted).]

9

On January 9, 2014, Plaintiff went to the emergency room for a migraine because her friend that accompanied her said was speaking nonsensical gibberish, and she was asking about her father who had died five years before. [Filing No. 6-8, at ECF p. 29.] Plaintiff's speech was observed to be "clear in triage." [Filing No. 6-8, at ECF p. 28.] She admitted that she did not take her Relpax that day, but she reported being compliant with taking her other relevant Zonisamide prescription. [Filing No. 6-8, at ECF p. 29.] On January 23, 2014, Plaintiff reported to her neurology provider that Relpax was generally effective within thirty minutes of taking it. [Filing No. 6-9, at ECF p. 11.] On June 13, 2014, Plaintiff returned to the emergency room for a "complex headache" with reported difficulty speaking and moving her hands. [Filing No. 6-8, at ECF p. 92.] During triage, she was able to answer questions but in "halting speech" and she was holding her hand outstretched. *Id*. Plaintiff reported that her symptoms were consistent with "her typical migraine," and she usually took Relpax, but she had not taken it that day. [Filing No. 6-8, at ECF p. 93.] There is evidence that Plaintiff did not always take her prescribed Relpax when she had migraines prior to the period that she is asserting disability.

However, the ALJ did not confront other relevant evidence. On July 7, 2014, shortly after Plaintiff's amended alleged onset of disability, she reported to her neurology provider that her migraines had increased in frequency and severity in the last three weeks, she was taking Zonegran as prescribed, Relpax frequently, and hydrocodone no more than three times a week at night. [Filing No. 6-9, at ECF p. 7.] She reported that Relpax was "less effective." [Filing No. 6-9, at ECF p. 6.] On September 26, 2016, after Plaintiff had resumed earning substantial gainful activity working at the library, she visited the emergency room with a migraine headache and reported that she had taken Relpax that day "with little relief." [Filing No. 6-12, at ECF p.

13.] The ALJ did not demonstrate that she considered the relevant evidence concerning Relpax's effectiveness during and shortly after the period at issue.

The ALJ also explained that before the period at issue "[i]n February 2014, [Plaintiff] saw a different neurologist who made several recommendations including Botox injections, a trial of Namenda, long-term magnesium and riboflavin, and well controlled obstructive sleep apnea. It appears she did not try many of these recommendations." [Filing No. 6-19, at ECF p. 23 (citations omitted).] Plaintiff first visited neurologist Caryn M. Vogel for treatment of intractable migraines on February 26, 2014. [Filing No. 6-16, at ECF p. 68.] Dr. Vogel prescribed magnesium oxide and riboflavin supplements. [Filing No. 6-16, at ECF p. 69.] Dr. Vogel also recommended Botox injections or alternatively a trial of Namenda "used off label for chronic migraines." *Id*.; *see supra* note 2 (Namenda is a name brand of memantine).

Contrary to the ALJ's express conclusion, Plaintiff tried all of Dr. Vogel's recommendations. As the ALJ explained, Plaintiff got Botox injections in August and October 2014 from another neurologist, and she reported that they helped the severity but not frequency of her headaches; however, she also reported in April 2015 that her insurance no longer covered the treatment; and she further reported that her obstructive sleep apnea was asymptomatic with use of a CPAP device. [Filing No. 6-19, at ECF p. 23.] Plaintiff was still taking a magnesium oxide supplement when she ultimately returned to Dr. Vogel on June 30, 2016.[5] [Filing No. 6-

---

[5] In the interim between Plaintiff's treatment visits with Dr. Vogel in February 2014 and June 2016, she went to another neurologist who increased the dosage of her Topamax on April 13, 2015. [Filing No. 6-17, at ECF p. 40.] On June 18, 2015, Plaintiff reported to another provider that Topamax was "working well" for migraine management, her migraines had decreased, and she noted improvement with her concentration that allowed her to get tasks completed. [Filing No. 6-13, at ECF p. 24.] However, by March 28, 2016, she reported that she had four migraines per week, and she wanted to be referred to another neurologist. [Filing No. 6-14, at ECF p. 12.] Plaintiff also testified that she kept headache diaries including the food she ate and medications

11

16, at ECF p. 65.] Dr. Vogel prescribed memantine. [Filing No. 6-16, at ECF p. 66.] On August 29, 2016, Dr. Vogel recorded that Plaintiff had "noted a marked improvement with her memantine, supplements and life[]style changes." [Filing No. 6-16, at ECF p. 62.] As previously noted, Plaintiff testified at her first hearing that memantine was the reason that she was able to successfully sustain work at the library. However, the ALJ did not mention Plaintiff's use of memantine.

     Accordingly, there is no logical and accurate bridge from the evidence to the ALJ's conclusion concerning whether Plaintiff's migraines medically equaled Listing 11.02 during the period at issue. Even if the Commissioner's argument that the ALJ's RFC-related discussion of Plaintiff's lack of adherence to prescribed treatment could provide a logical bridge to the ALJ's conclusion that Plaintiff was not presumptively disabled, the ALJ's decision includes too many omissions and inaccuracies for the Court to confidently conclude that she accurately considered the relevant evidence. The Commissioner also contends that according to SSR 17-2p (S.S.A. Mar. 27, 2017), 2017 WL 3928306, at *3-4, there was not necessary evidence from a qualified medical professional that Plaintiff's migraines equaled the listing, and the ALJ is not required to develop the record with the further assistance of a medical expert if she does not believe the record at the hearing level supports medical equivalence. [Filing No. 11, at ECF p. 7-8.] The Commissioner does not provide any legal authority that SSR 17-2p is applicable to Plaintiff's case. In her reply, Plaintiff insinuates without any supporting legal authority that SSR 17-2p does not apply because she filed her case in 2014, well before the March 27, 2017, effective date of the ruling. [Filing No. 12, at ECF p. 3.] Without any briefing by the parties about the

---

she took, but she and her treating providers were not able to identify any pattern. [Filing No. 6-2, at ECF p. 52.]

applicability of SSR 17-2p, the Court declines to decide the issue because, regardless of the applicability of the ruling, the ALJ must provide some explanation why the record evidence does not equal a relevant listing.  SSR 17-2p explains:

> Generally, a statement that the individual's impairment(s) does not medically equal a listed impairment constitutes sufficient articulation for this finding.  An adjudicator's articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at step 3.

2017 WL 3928306, at *4.  As already explained, the ALJ did not provide a logical and accurate rationale, even when considering her decision as a whole.  Accordingly, remand is necessary for further consideration of whether Plaintiff's migraines equaled Listing 11.02.

**B. District Court Remand Order**

The certified record does not include this Court's order previously remanding Plaintiff's case.  During the most recent hearing, the ALJ noted that the order was not an exhibit, but it was in the "case documents," and she had reviewed it.  [Filing No. 6-20, at ECF p. 9.]  Plaintiff has submitted the previous order along with her appeal and her argument that the ALJ did not comply with the order's remand instructions.  The order explained that the ALJ had ostensibly considered the evidence regarding the closed period that Plaintiff was not earning substantial gainful activity, but the ALJ had not demonstrated that she considered the voluminous evidence submitted by Plaintiff concerning her migraines during that period.  [Filing No. 10-2, at ECF p. 7-8.]  The Court explained that the Seventh Circuit has repeatedly held that the ALJ may not analyze only the evidence supporting her ultimate conclusion.  [Filing No. 10-2, at ECF p. 8-9 (citing *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) (other citations omitted)).]  The Court referenced Plaintiff's testimony that she was able to successfully sustain work because she

was prescribed a new medication and her new employer accommodated her migraine symptoms.

[Filing No. 10-2, at ECF p. 9.]  The Court concluded:

> On remand, further consideration of Kimberly K.'s migraine headaches impairment is needed.  The ALJ should confront the full evidence of record and consider whether the record establishes a closed period of entitlement to benefits.  In doing so, the ALJ should determine whether the evidence established both disability and medical improvement as required to find a closed [] period.

[Filing No. 10-2, at ECF p. 9-10.]

To a certain extent, the ALJ complied with the order.  She demonstrated that she considered the evidence pertaining to Plaintiff's migraines during the closed period that she is seeking benefits between July 1, 2014, and May 31, 2016.  However, the ALJ did not consider the relevant evidence identified above concerning Plaintiff's use of Relpax and memantine.  In addition, the ALJ also did not expressly address medical improvement.  The ALJ did conclude that Plaintiff was not disabled "at any time" during the closed period.  [Filing No. 6-19, at ECF p. 28.]  The ALJ explained her adverse credibility finding necessary to reach that conclusion, in part, by "not[ing] that [Plaintiff's employment] was terminated in July 2014 after [she] receiv[ed] a[n] SGA [substantial gainful activity] denial."  [Filing No. 6-19, at ECF p. 25 (citations omitted).]  The ALJ further explained:

> The undersigned was unable to locate any objective evidence regarding the reason for termination.  Within a few weeks, she was working a skilled job, although part time and below SGA.  She worked consistently during the period at issue and returned to SGA prior to starting any new treatments or medications.

[Filing No. 6-19, at ECF p. 25-26 (citations omitted).]

The ALJ found the evidence concerning Plaintiff's employment ending with the Villages in July 2014 to be inadequate to bolster her credibility because the evidence was not "objective." The human resources manager for the Villages provided a letter dated August 19, 2014, "to

14

confirm [Plaintiff's] termination of employment effective 7/15/14." [Filing No. 6-5, at ECF p. 23.] But the letter does not indicate what led to the termination or who initiated it.

However, the ALJ did not demonstrate that she considered the relevant evidence concerning Plaintiff's various employments. For example, on November 24, 2014, Plaintiff reported to her neurology provider who was administering her Botox injections that "[s]he lost her job in July 2014, [due to] missed work[]days secondary to migraines." [Filing No. 6-17, at ECF p. 43.] Plaintiff testified at her first hearing that after the Villages, she started working part time as an adjunct professor because she could work from home, she did not have to be anywhere at a set time, she did not have to create a syllabus or plan activities for each class, and she basically just graded papers and answered questions by email. [Filing No. 6-17, at ECF p. 56-58.] She also did another part-time job preparing a newsletter, but she could set her own schedule and did that work from home. [Filing No. 6-17, at ECF p. 58.] During the most recent hearing, Plaintiff further explained that her professor job allowed her to record her lectures ahead of time "in the comfort of [her] own home and at [her] own convenience when headaches allowed." [Filing No. 6-20, at ECF p. 15.] The ALJ did not demonstrate that she took Plaintiff's testimony and reports into consideration, including Plaintiff's testimony that she was able to work a flexible schedule at the library when she successfully returned to earning substantial gainful activity.

Ultimately, the ALJ's credibility evaluation is given considerable deference, at least to the extent the ALJ's conclusions are tied to an accurately stated record. *See, e.g.*, *Terry v. Astrue, 580 F.3d 471, 477 (7th Cir. 2009)*. However, the Court cannot confidently conclude that the ALJ considered the relevant evidence concerning the closed period that Plaintiff is seeking. To allow meaningful review of any subsequent decision on remand, the ALJ should address:

1. Whether the evidence of Plaintiff's migraines equaled Listing 11.02, the requirement(s) that was lacking if she did not equal the listing, and how the record supports any material conclusions.

2. Whether Plaintiff was disabled during a closed period between approximately July 1, 2014, and May 31, 2016, the factual and legal bases that establish the ALJ's relevant conclusions, including whether the record provides a basis to find medical improvement occurred, and if medical improvement is not implicated by the case, the basis of that legal conclusion.

3. To the extent that a credibility evaluation is material to any of the ALJ's conclusions, the relevant evidence from just before, during, and just after the closed period that informed the credibility evaluation, including: (a) the evidence concerning Plaintiff's employment,[6] and (b) the evidence of her treatment for migraines (including the medications that she took like memantine), her response, and her relevant subjective reports to her providers about the efficacy of the treatment.

The list above is not necessarily exhaustive but should facilitate meaningful review.

Having found remand necessary because of the logical bridge deficiencies identified above, the Court declines to address Plaintiff's remaining arguments.

## IV.    Conclusion

For the reasons explained above, Plaintiff's request for remand is granted.  [Filing No. 10.]  The ALJ's decision is remanded, for further proceedings consistent with this order, including further consideration of Plaintiff's functional

---

[6] Plaintiff may wish to develop the record and bolster her own reports by getting relevant corroboration from her past and present employers.

ability related to her migraines at Step Three and beyond relative to the closed period that she is seeking. Final judgment will issue accordingly.

Date: 10/20/2022

*[signature]*

Tim A. Baker
United States Magistrate Judge
Southern District of Indiana

Distribution: All ECF-registered counsel of record by email.